ARTHUR J. L. HUTCHINSON,
Plaintiff,

*vs.*

THE FISH ENGINEERING CORPORATION, a Delaware corporation, and PACIFIC NORTHWEST PIPELINE CORPORATION, a Delaware corporation, DOE ONE, DOE TWO, DOE THREE, DOE FOUR, DOE FIVE AND DOE SIX,
Defendants.

*New Castle, May 18, 1964.*

*Herbert L. Cobin,* of Coxe, Booker, Walls & Cobin, Wilmington, and *Leonard J. Meyberg,* Los Angeles, Cal., for plaintiff.

*Arthur G. Connolly* and *Januar D. Bove, Jr.,* of Connolly, Bove & Lodge, Wilmington, and *Robert F. Campbell,* of Andrews, Kurth, Campbell & Jones, Houston, Tex., for defendant, The Fish Engineering Corp.

*John VanBrunt, Jr.,* and *Andrew G. T. Moore, II,* of Killoran & VanBrunt, Wilmington, for defendant, Pacific Northwest Pipeline Corp.

Seitz, Chancellor: The plaintiff, Arthur J. L. Hutchinson, claims the ownership of six patents (designated herein as the (a), (b), and (c) patents and the (d), (e), and (f) patents) and damages for their alleged wrongful use or detention by the defendants, The Fish Engineering Corporation ("Fish Company") and Pacific Northwest Pipeline Corporation ("Pacific"). The substance of his claims are set forth in an earlier opinion in which this court denied the defendants' joint motions for summary judgment on the grounds of laches or limitations and defendant Pacific's separate motion on another ground. See *Hutchinson v. The Fish Engineering Corp.,* 41 *Del.Ch.* 134, 189 *A.2d* 664. This is the decision after final hearing.

Fish Company was organized in 1946 for the purpose of performing engineering services in connection with the design and construction of installations in the oil, gas, and chemical fields. Ray Fish was the founder of the company, its principal stockholder, its chief executive officer, and undoubtedly its guiding spirit. Fish was joined in 1946 by plaintiff and several other persons who thereafter participated percentagewise in the stock ownership of the Fish Company and formed the nucleus of its management. In later years Fish was instrumental in organizing a number of affiliated companies which became the means by which the Fish organization participated in specific construction projects. As each of these companies was formed, the stockholders of the Fish Company were permitted to purchase a portion of the shares of such companies equal in proportion to the amount of Fish Company stock which they owned.

Although the plaintiff joined the enterprise at an early stage, he did not play an active role in the promotion and organization of the company. Before his employment by Fish Company he had worked for a number of years as a process engineer for the Fluor Corporation. He had also been active in conducing research for Fluor and had developed a number of patents which he had assigned to Fluor as his then employer. He was asked by Fish to join the company because of his considerable experience in process and research, and it was understood that he would be the company's chief employee in these areas.

Although the plaintiff was given an option to purchase 15% of Fish Company's stock when he joined the company in 1946, he was unable to raise the necessary investment capital at that time. In 1948, however, arrangements were made by Ray Fish whereby plaintiff was enabled to purchase 7½% of the company's stock which Fish himself owned. At that time plaintiff also became a member of Fish Company's board of directors and thereafter attended the meetings of the board on a regular basis. He had participated in the management of the company prior to that time, but only on an informal basis.

Plaintiff served as a full-time employee of Fish Company from 1946 through 1950 and received a substantial annual salary for his services as well as several end-of-year bonuses and a proportionate stock interest in the various Fish Company affiliates as they were organized. In 1951, plaintiff was forced to leave Houston, Texas, the location of Fish Company's main offices, for the drier climate of California because of ill health. As a result, plaintiff entered into an agreement with the Fish Company on January 24, 1951, under the terms of which he became a part-time consultant of the company on an exclusive basis for a period of five years or until January 1, 1956. The circumstances surrounding the execution of this instrument and the significance of the purported change in his employment status are considered more fully later herein. In January of 1956, the term of the consulting agreement was extended by mutual agreement for a period of three months ending March 31, 1956. By the latter date, however, a serious controversy had arisen between plaintiff and the

Fish Company concerning the ownership of the (d), (e), and (f) patents, and his contract of employment was not renewed.

In the latter part of 1956 and early 1957, plaintiff's attorney, Mr. Meyberg, corresponded with defendants and their attorneys with respect to plaintiff's rights in all six patents involved in this action. Efforts at settlement proved inconclusive. On June 29, 1957, a Notice of Rescission was sent to Fish Company repudiating the assignments of the (a), (b), and (c) patents and the various contracts or transactions under which Fish Company purported to claim ownership of all six patents. Fish Company rejected this notice on July 12, 1957. Subsequently, in 1958, Fish Company and Pacific granted a license under the (d), (e), and (f) patents to a third party, and Fish Company tendered plaintiff ten per cent of the royalties earned thereunder, pursuant to terms of the purported July 24, 1954 contract, discussed later herein. Plaintiff rejected the tender, and in February 1959, his attorney filed this action.

I turn first to plaintiff's claims with respect to the (a), (b), and (c) patents all of which were developed prior to the execution of the consulting agreement in 1951. By way of background, the inventions embodied in these patents are a pulsation dampener, a process for the selective separation of acid gases, and a variable capacity dust scrubber remover respectively. Each is useful in dealing with certain specific problems that are ordinarily encountered in the construction and maintenance of gas pipeline systems. It is undisputed that Fish Company made extensive use of devices covered by the (a) and (c) patents in equipment installed by itself or its affiliates though the process covered by the (b) patent was apparently never put into use. In each instance all the development costs and all the expenses of patent prosecution were paid by Fish Company, and its lawyers handled the patent work with the plaintiff's assistance.

Plaintiff assigned the (a) and (c) patents to Fish Company at its request in 1948 and 1949 respectively and the (b) patent in 1951. Plaintiff received no additional compensation for any of these assignments or for Fish Company's use of these patents.

■ Plaintiff claims that Fish Company's officers and patent attorneys obtained the patents by fraudulently representing to him that as an employee of Fish Company he had a legal duty to execute the assignments. He urges that a kind of confidential relationship existed between himself and his associates in the Fish Company which required them to deal fairly with him, and not at arms' length, and that such persons knowingly abused this relationship in obtaining assignments of the patents. He prays therefore for rescission of such assignments and reconveyance of the patents as well as damages for their conversion or wrongful detention.

There is in my opinion no substance whatever to plaintiff's claim that he was induced to execute assignments of the (a), (b), and (c) patents by the fraudulent conduct of Fish Company or its attorneys. The simple fact is that from the time he joined the Fish Company in 1946, both he and his associates mutually acted in the belief that Fish Company was entitled to the patents of its employees developed in the course of its business. While he alone among the founders of the company had a substantial interest in developing a policy that would compensate employees for their inventions, he never quarreled with the fact that Fish Company did have an operative policy with respect to such inventions even though he was unhappy with the policy that was then in effect. Moreover, in evaluating the substance of his claim of fraud, I think it significant that plaintiff does not claim that Fish or Fish Company's patent attorneys withheld or concealed any "facts" bearing on his obligation to assign the patents, nor is there any suggestion in the record that they did not believe the truth of the assertions when they were made. I conclude that to the extent that these representations were the motivating factor underlying plaintiff's assignment of the (a), (b), and (c) patents to the Fish Company, they were made in good faith in the belief that Fish Company owned the patents and can in no way be characterized as "fraudulent", and it follows that plaintiff's claim for rescission on this ground must fail.

■ While the record herein provides a substantial basis on which the court might have concluded that Fish Company was legally entitled to an assignment of these patents as an implied condition of plaintiff's contract of employment, it is unnecessary to decide this question here.

I say this because, assuming without deciding that absent a finding of fraud plaintiff could establish some other legal basis for rescinding the assignments in issue, I am nonetheless satisfied that any such claim is barred under the doctrines of laches. The record herein amply demonstrates that plaintiff stood by and did nothing from and after the first assignment in 1948 until the assertion of his present claims to these patents in 1957. During that period he knew that the Fish Company was making use of the patents and patented devices under a claim of ownership after having expended considerable sums in their development. Plaintiff in my opinion had full knowledge of, or independent access to, all the facts necessary to an assertion of his alleged claims on the date that each of these assignments was made and had a legal duty under the circumstances to come forward and do so. He failed to take action at the appropriate time in each instance and did not even communicate his claims to the Fish Company until several years later. Moreover, this delay took place while defendant Fish Company, to plaintiff's knowledge, clearly changed its position materially and to its detriment. Thus, I believe that these facts fully justify the court in using a rather short period of time to fulfill the lapse-of-time requirement of laches. I note that the Texas statute of limitations which might be applied by analogy is two years.

Plaintiff seeks to justify his delay in making known his claims to these patents on the ground that Ray Fish fraudulently induced him to believe by various promises or assurances that he would ultimately be rewarded for Fish Company's use or exploitation of the patents. I find plaintiff's testimony to that effect wholly unacceptable. Such promises or assurances, including an alleged oral commitment by Fish in January of 1951, in my opinion were never made or given. Passing over the fact that plaintiff produced not a single shred of corroborative evidence apart from his own testimony, I think that an evaluation of the relationship of Fish Company's interest in patent ownership to its business needs strikingly reveals the improbability of any such promises or assurances ever having been made or given.

Nor do I find any basis for plaintiff's contention that Fish or plaintiff's other associates abused any confidence which plaintiff may

have reposed in them. Indeed, I think, to the contrary, that plaintiff was well treated by them.

There being no legally acceptable explanation for his inaction, and Fish Company having changed its position to its substantial prejudice, I conclude that plaintiff's claims to the (a), (b), and (c) patents are barred by laches, even assuming that under the law such patents would have belonged to plaintiff, a most dubious assumption under the present facts. His complaint for rescission, reconveyance, and an accounting with respect to such patents must therefore be dismissed.

I turn next to plaintiff's claims with respect to the (d), (e), and (f) patents, all of which were issued in his name and which he refused to assign to Fish Company. The defendants, Fish Company and Pacific, have made extensive use of devices incorporating these patents, and Fish Company claims that it is the owner of the patents by virtue of an agreement executed by the plaintiff in July of 1954 under the terms of which plaintiff agreed to assign any future inventions he might make to the Fish Company. The ideas on which the (d), (e), and (f) patents are based were admittedly conceived by the plaintiff and disclosed to Fish Company's personnel after the execution of the 1954 contract.

In order to place plaintiff's claims to these patents in their proper perspective, it is necessary to review some of the background of plaintiff's connection with the Fish Company from and after January 1951, when, for reasons of health, he moved to California. On January 24, 1951, he entered into an agreement with the Fish Company under the terms of which he became a part-time consultant of the company on an exclusive basis for a period of five years or until January 1, 1956. That agreement, drawn in letter form, recited the following:

> "* * * In view of this [plaintiff's departure from Houston], it is imperative that we make necessary adjustments in our organization to accommodate your being away from the direct administration of our process and research activities. However, we do want you identified with our corporation as a consultant on an exclusive basis in the capacity of director of process and research to the extent that you are able. In addition, of course, we want

you to continue at least for the present as a director of The Fish Engineering Corporation. Your efforts, as in the past, shall be devoted to research and processing work as pertaining to the gas, oil, chemical and other allied industries with which we are or may become identified from time to time. It is our whole-hearted intent to keep you active with our organization as long as your health permits."

The agreement also provided that Fish Company and its various affiliates would buy back from the plaintiff his shares of stock in these companies at their respective book values.

■ Plaintiff asserts that at the time of the signing of this so-called consulting agreement Ray Fish orally promised him that Fish Company would execute an agreement, when the last of the pending (a), (b), and (c) patents was issued, to pay him 10% of any profits earned by Fish Company from such patents. Admittedly, the consulting agreement as written makes no reference to this alleged oral promise,[1] and I have concluded earlier herein that no such promise was ever made. However, it is necessary to refer to this "promise" because it is a material factor underlying plaintiff's claim that the contract in the record is not the agreement he signed in 1954.

Plaintiff concedes that after January 1951, he made no reference to Fish's alleged promise until calling it to his attention in July 1954. Earlier in that month notice had been received from the U. S. Patent Office that the (c) patent (the last of the (a), (b), and (c) patents) would shortly be issued. Plaintiff claims that at his insistence Fish thereafter executed a written contract embodying the terms of his alleged oral commitment of January 1951. This purported contract of July 24, 1954 is said by plaintiff to have guaranteed him 10% of any profits earned by Fish Company from and after January 1951, either from the use of (a), (b), and (c) patents by Fish Company or from a sale of patent rights to others.

---

1. At the trial the defendants made timely objection to the admission of any evidence relating to this alleged oral promise under the Parol Evidence Rule. In view of the conclusions reached herein I do not reach the question of the applicability of this rule to the facts of this case.

Plaintiff also claims that this contract expressly gave Fish Company the right to obtain an exclusive license on any future patents that plaintiff might develop during his employment by Fish Company under the consulting agreement, or within one year thereafter, provided that Fish Company agreed to assume all the costs of prosecuting such patents and to pay plaintiff 10% of its profits from their use or exploitation. Under plaintiff's version of the 1954 contract he would remain the owner of any patents he subsequently developed.

There is in this record a different agreement, also dated July 24, 1954 and signed by plaintiff, which only purports to promise plaintiff 10% of any moneys actually received by Fish Company from the sale of rights as such under patents assigned by him to the Fish Company. The defendants say that this is the contract that plaintiff signed in 1954. Plaintiff in substance intimates that pages of the agreement he signed were replaced by pages containing different terms. He says that he did not receive a copy when he signed and thus has no written version of the agreement which he allegedly signed. Defendants deny this claim. The scope of the agreement in the record is set forth in paragraph (1) thereof:

> "Hutchinson agrees that any improvements invented, conceived, made or suggested by him solely or jointly during his employment under said agreement dated January 24, 1951, and within one year immediately following the termination of said agreement or any extension thereof and relating to the business of Fish or the work performed by him under said agreement, shall become the absolute property of Fish, its successors or assigns, and that he will at any time, at the request of Fish, execute any patent papers covering said improvements, as well as assignments thereof to Fish, and any other papers that Fish may consider necessary or helpful in the prosecution of applications for patent thereon or which relate to any litigation or controversy in connection therewith."

Since this agreement by its terms applies only to future patents, it admittedly would have no application to the (a), (b), and (c) patents and thus is wholly inconsistent with the terms of the agreement which plaintiff says he signed.

I find, notwithstanding plaintiff's assertions to the contrary, that the agreement in the record is in fact the agreement signed by the plaintiff in 1954. The facts surrounding the execution of this contract and particularly the discrepancy between the date on which it purports to have been signed and the date on which plaintiff's signature was acknowledged were developed at some length both on discovery and at trial. I am satisfied that plaintiff and Fish Company reached an agreement as to terms on July 24, 1954 on the basis of a preliminary draft which the parties had before them and that the contract in the record, though back-dated to July 24, 1954, was signed by the plaintiff on July 27. Apparently his signature was later inadvertently acknowledged by a notary as of July 24, the date appearing on the face of the instrument.[2]

Plaintiff failed to present in my opinion a reasonable explanation for the presence of his signature on the contract that is in the record. Indeed, his description of the "facts" surrounding the execution of the agreement he says he signed is unacceptable. I conclude therefore that the contract in the record is in fact the agreement of the parties and to the extent that it is valid and legally enforceable, it must govern the rights of the parties to the (d), (e), and (f) patents.

Next, I consider the more substantial contentions of plaintiff that the 1954 contract in the record is invalid and legally unenforceable. I assume that the laws of the State of Texas are applicable here, since the contract was executed and was intended to be performed in that state. I add, however, that it does not appear that the governing rules of Texas law differ materially from those of the State of Delaware.

Plaintiff says that the agreement is not valid, because an executed copy was never delivered to him prior to April 1956, when the controversy arose between Fish Company and himself concerning the ownership of the (d), (e), and (f) patents. The defendants concede that after plaintiff signed duplicate copies of the 1954 contract, both copies were left at Fish Company's office in Houston for Ray Fish's signature. Admittedly, neither of the copies was thereafter delivered

2. Plaintiff does not contend that the backdating of the contract or of the acknowledgment has any legal bearing on the validity of the agreement, and I conclude that it is not a material consideration herein.

to the plaintiff until he challenged Fish Company's claim that it owned the (d), (e), and (f) patents by virtue of such agreement in April 1956. The record is clear, however, that plaintiff never requested a copy of the agreement, never questioned the fact that it was in effect between the parties, and never made an effort to repudiate it at least until 1956.

The defendants contend that the parties to the agreement never intended physical delivery of the instrument to be a condition to its effectiveness and urge that the plaintiff's subsequent conduct amounted in any event to a waiver of delivery.

Under Texas law the "delivery" of a written instrument by parting with the possession or custody thereof is generally an essential element of its execution, 13 *Tex.Jur.* *(2d)* *"Contracts"*, § 82, *p*. 227. That rule has no application, however, where the parties manifest an intention that the agreement shall be binding without actual physical delivery as of the time it is signed by them. *Weaver v. Simmons*, 15 *Tex.Civ.App.* 154, 38 *S.W.* 1140; *Greenfield v. Murray, D.C.Mun. App.*, 117 *A.2d* 227; see 17 *C.J.S. Contracts* § 64. Where that is the intention of the parties their agreement is valid and binding even though it is understood on either side that a copy is ultimately to be delivered to the party not having one. *Templeman v. Closs, Tex.Civ. App.*, 212 *S.W.* 187.

The terms of the contract as such were agreed upon on July 24 on the basis of the original draft which the parties had before them. No changes of substance were made therein, and the draft was returned to Helmig, Fish Company's attorney, with instructions to draw up duplicate copies in final form. When plaintiff signed these copies on the 27th, he knew that Ray Fish had left Houston and understood that Fish would sign them when he returned. There is no doubt that he did so. I am satisfied that the situation of the parties amply demonstrate that they intended the 1954 contract to be effective when Fish affixed his signature, and I conclude that the absence of actual physical delivery provides no legal basis for attacking the validity of the contract.

■ Next, plaintiff suggests a number of different possible legal infirmities, but all of them I think may be summarized under plaintiff's argument that the July 24, 1954 contract is lacking in mutuality of obligation.

As noted, under the terms of the 1954 contract plaintiff agreed that any inventions, inter alia, relating to the business belonged to Fish Company.

The consideration which Fish was to pay plaintiff is stated in the following terms:

"Fish agrees that in addition to the regular compensation paid to Hutchinson under said agreement dated January 24, 1951, it will pay to Hutchinson, his heirs or assigns, ten per cent (10%) of any moneys actually received by Fish from the sale of rights as such under any patents granted on the improvements assigned to Fish by Hutchinson under the terms of clause 1 above, and whether such moneys are received by Fish as paid-up lump sums or as installments or royalties derived from either assignment and sale of any interest in or license under such patent rights. This obligation shall continue throughout the life of each such patent, and payments hereunder to Hutchinson, his heirs or assigns, shall be made within sixty (60) days from receipt by Fish of the moneys aforesaid. No payment of any kind shall become due to Hutchinson with respect to any sale of patent rights or license granted under patent rights on said improvements and for which Fish has not directly received moneys specified as charged by Fish for the sale of patent rights or license under patent rights; to any manufacture, use, or sale by Fish of any method, composition, apparatus or anything of any nature which embodies the subject matter of said improvements; or to recoveries which may result from litigation dealing with infringement of patents on said improvements."

Plaintiff points out that under the terms of the agreement as set out above no payment becomes due him with respect to any sale of patent rights or any license granted under such patent rights unless Fish Company directly receives moneys specified as charged for any

such sale or license. Fish Company does not dispute that it was not then in the business of selling or licensing patent rights and admits that it had no current business which it considered as coming within the terms of the agreement. Indeed, Fish Company has urged throughout the course of these proceedings that until it granted a license under the (d), (e), and (f) patents in 1958, it never intended to engage in the business of selling or licensing patent rights as such and sought patents principally for their defensive value. There is no doubt that under the terms of the 1954 agreement Fish Company was free to make use of the patents it obtained from plaintiff in equipment installed by itself or its affiliates for its customers without paying plaintiff anything provided it made no charge for the sale or licensing of patent rights as such.

Building on these premises, plaintiff claims that the agreement is legally defective because by its terms it purports to permit Fish Company to obtain assignments of any future inventions he might make relating to the business of the company notwithstanding the fact that no obligation is imposed on the company either to pay him for the use of these inventions or to exploit them commercially under an arrangement that would assure him some remuneration for having made assignments thereof. Thus, plaintiff takes the position that in this context Fish Company's promise to pay him 10% of any moneys actually received is at best illusory, and since Fish Company in reality was not bound to do anything, the agreement cannot be enforced against him.

Is the contract of July 1954 lacking in mutuality of obligation? When the 1954 contract was executed, plaintiff's employment by the Fish Company was governed by the exclusive consulting agreement of 1951. Up to that time no controversy had arisen between plaintiff and Fish Company concerning the ownership of any patents he had developed. I have rejected earlier herein plaintiff's testimony that Ray Fish promised him in 1951, when the consulting agreement was signed, or indeed at any other time, that he would be compensated for having assigned the (a), (b), and (c) patents to the Fish Company. Absent these alleged oral promises or assurances the record I think conclusively establishes that up to the time the 1954 contract was executed, both plaintiff and his associates in the Fish Company continued to act

in the belief that Fish Company was legally entitled to an assignment of the inventions of its employees.

The execution of the consulting agreement did not in fact alter the attitude of these parties, since the agreement made it clear that plaintiff's efforts were to continue, "as in the past", to be devoted to research and processing work as pertaining to the gas, oil, chemical, and other allied industries. Indeed, plaintiff concedes that no disagreement arose with respect to Fish Company's rights even though he was only to be employed on a part-time basis because of his health. In the interim between the signing of the consulting agreement and the execution of the contract of July 1954, the plaintiff without protest assigned the (b) patent to the Fish Company and executed a corrected assignment of the (c) patent.

The record I think fairly establishes that the contract of July 1954 was executed at plaintiff's rather than Fish Company's insistence. Although he was receiving a substantial salary for his services, plaintiff continued to be dissatisfied with the fact that he was not being remunerated for the inventions he had created and had previously assigned to Fish Company as his employer.

In my opinion the principal purpose of the 1954 contract was merely to grant plaintiff a right to compensation which he previously had not had and at the same time to confirm Fish Company's assumed preexisting rights to future inventions. As I view the matter, the defendant Fish Company agreed to meet some of plaintiff's demands for compensation in order to head off a more serious confrontation with him over this very issue. Thus, each party was to give up some freedom of action. Contrary to plaintiff's contention, it was not necessary for Fish Company to agree to exploit plaintiff's patents only in a manner which would necessarily benefit plaintiff. It did restrict itself by agreeing to pay plaintiff if royalties were obtained. As so construed, there is no basis for his attacking the 1954 contract on the ground that it lacks mutuality of obligation.

Plaintiff appears to argue, however, that if the parties were incorrect in their assumption that he had a pre-existing legal duty to assign patents to the Fish Company, then at a minimum the 1954 con-

tract was founded on a mutual mistake of the parties and he is therefore entitled to a decree of rescission and a declaration that he is the owner of the (d), (e), and (f) patents. I conclude from my evaluation of the evidence, however, that plaintiff failed to prove a mutual mistake which would warrant the invalidation of the 1954 agreement. Regardless of the general law concerning the duty of an employee-inventor to assign his patents, I am satisfied that here a material part of the bargain was that plaintiff's pertinent patents would be the property of Fish Company. There is no reason for not honoring such an undertaking.

 ■ Because it may be desirable to have it resolved, I consider whether laches is also a ground for rejecting plaintiff's claim to the (d), (e), and (f) patents. By way of background, on June 18, 1954, the defendant Pacific Northwest received a certificate of public convenience and necessity from the Federal Power Commission permitting it to construct and operate natural gas production facilities in New Mexico and Colorado, Utah, Wyoming, Idaho, Oregon, and Washington. Pursuant to the terms of certain interim agreements, Pacific Northwest entered into a formal contract with Fish Northwest Constructors, Inc., an affiliate of the Fish Company having substantially the same stockholders, to design and supervise the construction of the pipeline system. The latter company was also charged under the contract with actual construction of compressor stations, dehydration units, and processing plants. Thereafter, Fish Northwest Constructors entered into an agreement with the Fish Company whereby the Fish Company agreed to perform engineering services in connection with the design and construction of these production facilities.

One of the problems anticipated in the successful development of the Pacific Northwest system was the removal of water from the natural gas before it was transported to the marketing areas. Dehydration is apparently a common problem in the operation of natural gas pipeline systems, and the (d), (e), and (f) patents based on ideas which plaintiff disclosed to the Fish Company in September 1954, were developed by the Fish Company for the purpose of providing an efficient and economical method of dehydration adequately suited to Pacific Northwest's needs. Prior to the development of these patents,

the so-called glycol amine process was widely used for dehydration purposes although a number of substances, including calcium chloride, were known to be effective dehydrating agents. The (d), (e), and (f) patents disclose a process and an accompanying apparatus permitting the successful dehydration of natural gas by calcium chloride. Ultimately the patented process and apparatus were adapted by the defendants with plaintiff's assistance for use in certain well head dehydrating units which were later manufactured by the Fish Company and installed on the production facilities of the Northwest Pipeline system.

Little purpose would be served in describing at any length the details of the development of the dehydration units ultimately used by Pacific Northwest. It will suffice to say that after Fish Company, Fish Northwest Constructors, and Pacific Northwest became interested in the use of calcium chloride, substantial testing of devices incorporating plaintiff's basic ideas was required and involved considerable expense to the defendants. Most of this testing was carried out during the year 1955 under the plaintiff's supervision. He was also active in assisting Fish Company's patent attorney, Mr. R. M. McManigal, to prepare the patent applications for the (d), (e), and (f) patents.

During this entire year of testing which ultimately led to the construction by Fish Company of a plant to manufacture the units, plaintiff never once openly disputed Fish Company's ownership of the (d), (e), and (f) patents. Indeed, the record contains a number of letters he wrote from which one can only infer that Fish Company's rights were recognized by him. Of particular significance is a letter addressed to Ray Fish dated June 26, 1955:

> "After making a search in the patent office it looks as if our new way of using calcium chloride for dehydration would be patentable and we (Mr. McManigal and plaintiff) are proceeding to file, both here and in Canada.

> "In this connection, I believe, we should set up a definite schedule of royalties on the process before any units are sold or put into operation. Bob Daugherty has made a study of the costs of field dehydration from which some basis of royalties could be

worked out. This royalty could be either a paid up royalty or a running royalty.

"* * * In this royalty set up I am doubly interested as I would like to see Fish Engineering make some money on this patent and I would like to get my 10%."

I think this letter points up the basic reason for this controversy. In my opinion plaintiff would have been content with the 1954 agreement had Fish Company exploited these patents in a way that produced royalties of substance so that he could obtain his percentage thereof. Since Fish Company did not sell or license patent rights as such as was its right, plaintiff did not receive anything under his 10% interest provision. His disappointment was predictable and it colors and explains many of his contentions and much of his testimony herein.

One of the firmest of equitable principles is that one may not slumber on his rights to the detriment of another and later attempt to assert them. The present case involves much more than mere delay on the part of the plaintiff. The ground on which he seeks in effect to attack the 1954 contract is that he had no pre-existing legal duty to execute assignments of his inventions to the Fish Company. This was an issue on which plaintiff had full knowledge of all the material facts at least eight years before the execution of the contract in question. His actions during this entire period were a confirmation of a mutual assumption which underlay the execution of that contract.

After the execution of the contract plaintiff gave no indication whatever either by his words or actions that that underlying assumption was false. Moreover, he made no effort to repudiate the contract itself during the time the defendants were expending considerable sums perfecting devices based on his inventions—inventions that the defendants believed in good faith belonged to the Fish Company under the terms of the contract. Clearly a manifest injustice would be worked on the defendants if after this long period of silence and prejudicial change of position plaintiff were permitted to undo these transactions and claim the ownership of these patents or profits from their use or exploitation. I conclude that under these circumstances

plaintiff is also barred by laches from asserting any claim to the (d), (e), and (f) patents.

It follows that plaintiff's complaint against Fish Company as to the (d), (e), and (f) patents must be dismissed on the merits and also because of plaintiff's laches.

Plaintiff does not suggest that Pacific is liable apart from the alleged liability of Fish as a joint tortfeasor. Since I have found that plaintiff's claims against Fish Company must be dismissed, it therefore follows that plaintiff's claim against Pacific must also be dismissed. It is unnecessary to consider other defenses asserted by defendants.

Finally, I must consider Fish Company's counterclaim seeking to compel plaintiff to assign the (d), (e), and (f) patents to the Fish Company pursuant to the requirements of the 1954 agreement. As previously decided plaintiff has shown no legal basis for attacking the 1954 agreement. But plaintiff says it is inequitable in fact to specifically enforce their agreement for the Fish Company because under the agreement Fish Company was not required to exploit the patents in a way which would benefit him. Had this been an agreement sought by Fish Company a more appealing case might have been made for plaintiff. However, in fact plaintiff, as I have found, sought and obtained this agreement and must be held to its terms. Moreover, plaintiff was in fact fairly treated by the Fish Company. Fish Company is therefore entitled to a judgment requiring plaintiff to assign the (d), (e), and (f) patents to it.

Present order on notice.